**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**


KRISTAL GAYLE KEITH,        )
                                      )
            Plaintiff,      )
                                      )     Civil Action No. 12-1198
           v.            )
                                      )     Judge Nora Barry Fischer
CAROLYN W. COLVIN,        )
Acting Commissioner of      )
Social Security,           )
                                      )
           Defendant.    )


## <u>MEMORANDUM OPINION</u>


## I.    INTRODUCTION

Kristal Gayle Keith ("Plaintiff") brings this action pursuant to 42 U.S.C. §§ 1383 (c)(3), 405(g), seeking judicial review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for supplemental security income ("SSI") benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f ("Act"). The record has been developed at the administrative level, and the parties have brought cross-motions for summary judgment. For the following reasons, the Court finds that the decision of the Administrative Law Judge ("ALJ") is supported by substantial evidence. Accordingly, Plaintiff's Motion for Summary Judgment[1] (Docket No. 10) is denied, and Defendant's Motion for Summary Judgment (Docket No. 12) is granted.

---

[1] Plaintiff's motion itself is entitled "Motion for Summary Judgment," (Docket No. 10), but the subsequent brief in support is styled "Memorandum of Law in Support of a Motion for Judgment on the Administrative Record and Pleadings Pursuant to Rule 12(C) F.R.C.P." (Docket No. 11) The difference in language does not appear to have

## II.    FACTUAL BACKGROUND

Plaintiff applied for SSI on July 21, 2009[2], alleging both physical and mental impairments due to ADHD, with a disability onset date of February 1, 2007. (R. at 142, 199).[3] Plaintiff subsequently amended her alleged onset date, given the advice of counsel, to July 10, 2009. (R. at 235). Following the initial denial of her application on October 28, 2009 (R. at 98-102), a hearing was held before an ALJ on November 30, 2010 at which Plaintiff and a vocational expert appeared and testified (R. at 35-80). The ALJ denied SSI benefits to Plaintiff on January 3, 2011. (R. at 6-26). Thereafter, Plaintiff filed a request for review by the Appeals Council. (R. at 4-5). The Appeals Council denied Plaintiff's request on June 29, 2012, thereby making the decision of the ALJ the final decision of the Commissioner. (R. at 1-6). Having exhausted all administrative remedies, Plaintiff filed this petition for judicial review on August 23, 2012. (Docket No. 3) Defendant filed an Answer on December 20, 2012. (Docket No. 6). Subsequently, Plaintiff moved for judgment on the pleadings with a supporting brief on January 17, 2013. (Docket Nos. 10-11). Defendant filed a motion for summary judgment and a brief in support on February 7, 2013. (Docket Nos. 12; 13).

### A. General Background

Plaintiff was born on February 16, 1989 and was twenty-one years of age at the time of her hearing.[4] (R. at 94).  She resided with her fiancé, her fiancé's father, and her son in West Brownsville, Pennsylvania, in a duplex next to which her fiancé's grandmother also resided. (R. at 46-68).  Prior to her July 21, 2009 filing, Plaintiff had applied successfully for disability SSI in

---

any intended significance. Thus, for consistency, the Court will refer to the motion as Plaintiff's Motion for Summary Judgment.

[2]      There is some disagreement in the record as to when Plaintiff filed for SSI. Her application lists the date as July 21, 2009, (R. at 142) but the ALJ hearing decision lists the date as July 10, 2009 (R. at 9).

[3]      Citations to ECF Nos., the Record, *hereinafter*, "R. at ___."

[4]      Plaintiff is defined as a "Younger Person," an individual between the ages of 18 and 49. 20 C.F.R. §§ 404.1563, 416.963.

2006, when she was a child, but these benefits were discontinued in May 2007. (R. at 135-141, 9). She had been unemployed for nearly two years by the time of the hearing. (R. at 53).

Plaintiff has completed ninth grade, but does not have a high school degree or a GED. (R. at 49-50). From first grade until completing the ninth grade, she was a special education student. (R. at 50). Since leaving high school, she has performed a number of unskilled, short-term and temporary jobs, all of which were in food preparation. (R. at 53, 218-226). Plaintiff's work history concluded in 2008 after a brief stint as a breakfast cook in a factory. (R. at 218). Her daily activities primarily consisted of watching television, interacting with her family, including her son, and taking walks. (R. at 61-63, 214).

### B. Medical History

Plaintiff's medical history includes major depressive disorder, borderline intellectual functioning, personality disorder, attention-deficit hyperactivity disorder ("ADHD"), lumbago[5], supra patellar malalignment[6] of the left knee with a subluxing patella,[7] and obesity. (R. at 11). In her Disability Report, Plaintiff claimed that ADHD limits her ability to work because it makes her a slow learner, unable to count money, and unable to fill out job applications without help. (R. at 199). She wears glasses and contact lenses. (R. at 166). At the time of her hearing, she smoked about half of a pack of cigarettes per day. (R. at 49).

### 1. Mental Impairments

---

[5]     Lumbago is "pain in mid and lower back; a descriptive term not specifying cause." STEDMAN'S MEDICAL DICTIONARY 1121 (28th ed. 2006).

[6]     A displaced patella occurs when the kneecap (patella) slips out of its groove on the thigh bone (femur). Without the kneecap in its proper position, the knee will not be able to lock into place or move across its normal range of motion. HalpernMD, *Patella Malalignment/ Dislocation*, *available at* http://www.halpernmd.com/index.php~practiceId=10047&lib=Injury&dir=categories&categoryId=197.html.

[7]     Patella subluxation is when the knee cap does not slide up and down in its normal groove, causing pain and discomfort. OrthopedicsAbout.com, *Pateller Subluxation*, *available at* http://orthopedics.about.com/cs/patelladisorders/a/kneecapdisloc.htm.

Although Plaintiff was not a child during the period at issue, school records are included because intellectual functioning and adaptive functioning before age 22 are at issue in this case. (R. 304-319). In 2004, when Plaintiff was in 8th grade, she received a Pennsylvania Parent Report, which indicated that she was "Below Basic" overall. (R. at 308). In 2005, Mars Area School District determined that Plaintiff had learning disabilities in basic reading and math reasoning. (R. at 446).

Dr. Randon C. Simmons conducted a psychiatric evaluation of Plaintiff on May 4, 2005 at the Irene Stacy Community Mental Health Center. (R. at 248). Plaintiff told Dr. Simmons that she was experiencing difficulty with friends, conflicts with her grandmother, trouble with her grades in high school, and an inability to focus. (*Id.*) Dr. Simmons diagnosed Plaintiff with depressive disorder, ADHD, and found that her psychological stressors included her lack of a relationship with her mother, and her grandmother's health problems. (R. at 249). He also noted that Plaintiff's teachers seemed to have little sympathy for her condition, and hoped that an outpatient therapist would be able to intervene in that area. (R. at 250). Plaintiff returned to Dr. Simmons periodically between June 23, 2005 and March 9, 2006. (R. 251- 54). Dr. Simmons noted that she was doing better with medication, though it is unclear what the medication was. (*Id.*)

A teacher questionnaire was completed by her school counselor Tina Bigante, as well as special education teachers Mike Deldrum and Michele Goodworth on May 2, 2006. (R. at 191-197). They had known Plaintiff for two years and found a "very serious problem" in understanding school and content vocabulary, reading and comprehending written material, comprehending and doing math problems, providing organized oral explanations and adequate descriptions, recalling and applying previously learned material, and applying problem solving

skills in class discussions. (R. at 191). They reported "a serious problem" in understanding and participating in class discussions, expressing ideas in written form, and learning new material. (*Id.*) She had "a very serious problem" working without distracting herself or others and working at a reasonable pace or finishing on time. (R. at 192). There was "a serious problem" carrying out multi-step instructions, completing class/homework assignments, and completing work accurately without careless mistakes. (*Id.*) She also had "a very serious problem" identifying and appropriately asserting emotional needs, responding appropriately to changes in her own mood, and in using appropriate coping skills to meet daily demands of the school environment. (R. at 195).

On April 11, 2007, Plaintiff underwent psychological testing with Vocational Psychological Services, administered by Drs. Martin Meyer, Ph.D. and Julie Uran Ph.D. (R. at 326). Plaintiff took the WAIS-III exam,[8] which yielded results of 69 (verbal); 76 (performance); and 79 (full scale). (R. at 327). The doctors observed that Plaintiff's ADHD caused her to be inattentive and that she suffered from cognitive delay, which affected her ability to learn. (R. at 329). The doctors put her at "fourth grade levels of scholastic achievement," but noted that one of her strengths was that she was "motivated toward employment." (*Id.*) Their final diagnosis was that Plaintiff suffered from Major Depressive Disorder (Severe without Psychotic Features), ADHD, and Mild Mental Retardation. (R. at 330).

On October 18, 2009, Dr. David Prybock, Ph.D. administered to Plaintiff a clinical psychological examination for the Bureau of Disability Determination. (R. at 389-395). She told Dr. Prybock that she has depression, and that she has two to three crying spells during the week, during which she feels helpless and hopeless. (R. at 389). She also explained that she has sudden

---

[8]     The Wechsler Adult Intelligence Scale is a test designed to measure intelligence in adults and older adolescents. Wikipedia, Wechsler Adult Intelligence Scale, *available at* http://en.wikipedia.org/wiki/Wechsler_Adult_Intelligence_Scale.

mood swings and can be irritable without warning. (*Id.*) She claimed that she was experiencing decreased motivation, a loss of interest in activities, a fluctuating appetite, and difficulty sleeping. (*Id.*) Plaintiff advised Dr. Prybock that she suffered from a learning disability that "makes it hard for [her] to think and learn quickly." (*Id.*) She claimed to drink only on occasion, though admitted first smoking marijuana at age 15. (*Id.*) She used cannabis "once or twice a day," but claimed not to have smoked for two years at the time of the evaluation. (*Id.*) Plaintiff additionally told Dr. Prybock that she experienced auditory hallucinations briefly after her grandmother died. (R. at 391). Plaintiff claimed to have heard her grandmother calling her name. (*Id.*)

Dr. Prybock found that Plaintiff had an average ability to think in the abstract, had a poor general fund of information, and was impaired in her ability to concentrate. (R. at 391-92). He then diagnosed her with Major Depressive Disorder, Recurrent, Severe, Without Psychotic Features; Cannabis Abuse by History; Rule Out Learning Disorder; and Personality Disorder Not Otherwise Specified. (R. at 392). Dr. Prybock classified her prognosis as "fair." (R. at 393).

### 2. Back Problems

Plaintiff has had intermittent back problems throughout her life. Dr. Andrew Fackler ordered her to undergo an x-ray of her back on February 10, 2005, which showed no fracture or malalignment in the thoracic spine. (R. at 276). However, the x-ray did reveal a mild narrowing at S1-S2. (R. at 275). Dr. Sarah Gilmour ordered Plaintiff to undergo a scoliosis study on April 14, 2005, which showed mild thoracolumbar S-shaped scoliosis. (R. at 274).

Dr. Richard D. Bruehlman saw Plaintiff at Renaissance Family Practice in Gibsonia on April 27, 2005. (R. at 246). She reported upper back discomfort that worsened with certain activities. (*Id.*) He recommended physical therapy, which Plaintiff and her mother agreed to

undergo. (*Id.*) Dr. Bruehlman told Plaintiff to see him again if she felt no improvement after one month, at which point he would refer her to an orthopedic spine doctor. (*Id.*)

Dr. James B. Minshull ordered Plaintiff to undergo a pelvic CT scan for urolithiasis[9] on August 11, 2005. (R. at 272). The scan showed a 2-mm mildly obstructing right UPJ calculus[10]. (*Id.*)

On September 15, 2005, when Plaintiff was 16, she presented to Dr. Matthew D. Goldinger following an episode of significant right back pain. (R. at 264). She had an unenhanced CT scan, which showed a 2 millimeter right UPJ calcification. (*Id.*) Dr. Goldinger recommended that Plaintiff undergo a cysto[11] with retrograde pyelogram,[12] right uteroscopy[13] with possible stone extraction and possible stent placement. (R. at 265). Plaintiff accepted the recommendation and underwent the surgery on October 7, 2005. (*Id.*) The procedure was performed by Dr. Mark Musmanno, M.D., and it resolved Plaintiff's flank pain but did not uncover any ureteral stones. (R. at 263).

Dr. Musmanno ordered a RT uteral pelvic junction stone on CT on August 18, 2005. (R. 270). Eight days later, Dr. Mary Diana Davis ordered Plaintiff to undergo a CR of the abdomen and pelvis to rule out a kidney stone. (R. at 268). On review, there was no evidence for left renal

---

[9] Urolithiasis is "the process of forming stones in the kidney, bladder, and/or urethra (urinary tract)." MedicineNet.com, Definition of Urolithiasis, *available at* http://www.medterms.com/script/main/art.asp?articlekey=6649.

[10] A ureteropelvic junction (UPJ) obstruction is a blockage which prevents fluid from draining out of the renal pelvis to the ureter, the tube which carries urine away to the bladder so that it can be expressed. What is Kindey Obstruction? *Available at* http://www.wisegeek.com/what-is-upj-obstruction.htm.

[11] Cystoscopy is a test that allows your doctor to look at the inside of the bladder and the urethra using a thin, lighted instrument called a cystoscope. WebMD, Cystoscopy, *available at* http://www.webmd.com/a-to-z-guides/cystoscopy-16692.

[12] The retrograde pyelogram uses a dye to determine whether a kidney stone or something else is blocking your urinary tract. WebMD, Retrograde Pyelogram, *available at* http://www.webmd.com/kidney-stones/retrograde-pyelogram-for-kidney-stones.

[13] The surgeon, often a urologist, doesn't make any incisions (cuts in the body) for this procedure. He or she first inserts a thin viewing instrument (ureteroscope) into the urethra (the tube that leads from the outside of the body to the bladder). Then, the doctor passes the ureteroscope through the bladder and the ureter, to get to where the kidney stone is located. WebMD, Uteroscopy, *available at* http://www.webmd.com/kidney-stones/ureteroscopy-16859.

stones or ureteral stone. (*Id.*). Then, on September 15, Dr. Mark Musmanno ordered an x-ray of Plaintiff's abdomen on September 15. It was read as inconclusive but may have shown a left ureteral calculus. (R. at 267). Subsequently, Plaintiff underwent a right retrograde urogram[14]. (R. at 266).

Plaintiff was next seen by Dr. Stephanie A. Gill for a gynecology/contraceptive counseling exam at UPMC St. Margaret Family Health Centers in Lawrenceville on February 18, 2009. (R. at 363). Plaintiff had given birth six weeks earlier, and received counseling on, among other things, contraceptive options, smoking cessation, nutrition, and breast self-exams. (R. at 365). She returned to the Family Health Centers on March 17, 2009 to begin receiving Depo-Provera[15], and Medroxyprogesterone[16] for birth control. (R. at 372). Then, Plaintiff underwent a colposcopy on March 23, 2009. (R. at 355). She returned to the Family Health Centers on April 14, 2009 for the results of the colposcopy and was diagnosed with Cin-III.[17] (R. at 367). As a result, Dr. Gill ordered her to have a LEEP,[18] which Plaintiff was cleared for physically by Dr. Gill on June 10, 2009. (R. at 335).

---

[14]    A retrograde pyelogram is a type of X-ray that allows visualization of the bladder, ureters, and renal pelvis. Generally, this test is performed during a procedure called cystoscopy – evaluation of the bladder with an endoscope (a long, flexible lighted tube). Johns Hopkins Medicine, Retrograde Pyelogram, *available at* http://www.hopkinsmedicine.org/healthlibrary/test_procedures/urology/retrograde_pyelogram_92,P07713/.

[15]    Depo-Provera is a birth control method for women. It is made up of a hormone similar to progesterone and is given as an injection by a doctor into the woman's arm or buttocks. Each shot provides protection against pregnancy for up to 14 weeks, but the shot must be received once every 12 weeks to remain fully protected. WebMD, Depo-Provera, *available at* http://www.webmd.com/sex/birth-control/birth-control-depo-provera.

[16]    Medroxyprogesterone is a progestin (a form of progesterone), a female hormone that helps regulate ovulation (the release of an egg from an ovary) and menstrual periods. Drugs.com, Medroxyprogesterone, *available at* http://www.drugs.com/medroxyprogesterone.html.

[17]    CIN III is considered the same as carcinoma in situ (CIS) or Stage 0 cervical cancer. The cancer has not yet invaded deeper tissues. However, if not surgically removed, there is a high chance it can progress to invasive cancer. New York Time Health, Cervical Cancer In-Depth Report, *available at* http://health.nytimes.com/health/guides/disease/cervical-cancer/print.html.

[18]    LEEP uses a thin wire loop electrode which is attached to an electrosurgical generator. The generator transmits a painless electrical current that quickly cuts away the affected cervical tissue in the immediate area of the loop wire. This causes the abnormal cells to rapidly heat and burst, and separates the tissue as the loop wire moves through the cervix. This technique allows your physician to send the excised tissue to the lab for further evaluation. About.com, Loop Electrosurgical Excision Procedure, *available at* http://womenshealth.about.com/cs/surgery/a/leepprocedure.htm.

On August 5, 2010, Plaintiff visited Dr. Pam Weakland, to whom she transferred for her Depo Provera injections. (R. at 472). Dr. Weakland noted that Plaintiff complained of lower back pain for many years. (*Id.*) Accordingly, Dr. Weakland ordered an x-ray and advised her that if the results of the x-ray did not preclude it, Plaintiff should embark on enter physical therapy. (R. at 474). The x-ray showed a normal lumbar spine series, so Plaintiff returned to Dr. Weakland on October 1 and agreed to begin physical therapy. (R. at 465-468).

Plaintiff presented to the Uniontown Hospital emergency room, complaining of whitish discharge, back pain, and lower abdominal pain on both sides on October 10, 2010. (R. at 454). She was seen by Dr. Cataldo F. Corrado, who diagnosed her with pelvic inflammatory disease,[19] prescribed doxycycline[20] and Flagyl[21], and then ordered her to follow up with her gynecologist. (R. at 455).

Plaintiff returned to Dr. Weakland on November 8, 2010, and he noted that Plaintiff had been to the ER, been diagnosed with pelvic inflammatory disease and given antibiotics. (R. at 450). Dr. Weakland also noted that Plaintiff had taken the antibiotics and her pain was "not as bad as before." (*Id.*)

Plaintiff attended physical therapy sessions under the supervision of Dr. Marvin McGowan, as ordered by Dr. Weakland, at Orthopedic & Sports Physical Therapy Associates, Inc. in Brownsville, PA beginning on October 13, 2010. (R. at 482). On her first visit, Plaintiff told Dr. McGowan that she had constant pain and was unable to walk, lift her son, or sleep

---

[19]     Pelvic inflammatory disease, commonly called PID, is an infection of the female reproductive organs. PID is one of the most serious complications of a sexually transmitted disease in women: It can lead to irreversible damage to the uterus, ovaries, fallopian tubes, or other parts of the female reproductive system, and is the primary preventable cause of infertility in women. WebMD, Pelvic Inflammatory Disease, *available at* http://women.webmd.com/guide/sexual-health-your-guide-to-pelvic-inflammatory-disease.

[20]     "Doxycycline is a tetracycline antibiotic… used to treat many different bacterial infections, such as urinary tract infections, acne, gonorrhea, and chlamydia, periodontitis (gum disease), and others." Drugs.com, Doxycycline, *available at* http://www.drugs.com/doxycycline.html.

[21]     "Flagyl (metronidazole) is an antibiotic… used to treat bacterial infections of the vagina, stomach, skin, joints, and respiratory tract." Drugs.com, Flagyl, *available at* http://www.drugs.com/flagyl.html.

through the night. (R. at 482). Dr. McGowan determined that she had severe pain, moderate range of motion deficits, and mild strength deficits. (*Id.*) He reported that her rehabilitation potential was good, and that she should engage in physical therapy twice a week for four weeks. (*Id.*) Plaintiff attended each of her physical therapy sessions following this visit. (R. at 476-479). She saw Dr. McGowan again on November 8, 2010 and he noted that her progress was good, but recommended that she continue to attend physical therapy for an additional four to six weeks. (R. at 480).

### 3. Knee Problems

Dr. Andrew C. Fackler saw Plaintiff on May 19, 2005 for pain in her left knee. (R. at 242). Plaintiff reported that she injured her knee by hitting it against pavement after tripping. (*Id.*) Dr. Fackler planned to determine whether it was a left knee contusion or a lateral meniscal tear. (*Id.*) He ordered an x-ray, which showed no fractures, so he recommended ice and ibuprofen, and instructed her to return to him in two weeks if she had not improved. (*Id.*)

On November 23, 2005, Dr. Robert Waltrip saw Plaintiff, who had been referred to his office, Tri Rivers Surgical Association, for evaluation of some knee pain. (R. at 283). Plaintiff stated that she had been having knee problems for the past three to four months, and that her knee cap frequently popped out of place, causing her a great deal of pain. (*Id.*) Dr. Waltrip's associate Dr. Daniel Kelly Agnew ordered an x-ray of her left knee, which showed small joint effusion.[22] (R. at 262). Dr. Waltrip decided to give Plaintiff crutches and ordered her not to put weight on the knee. (R. at 284). He suggested that she take anti-inflammatory over-the-counter medication and ordered her to undergo an MRI for further evaluation of the knee. (*Id.*) She had an MRI on December 12, 2005, which revealed only small joint effusion. (R. at 260, 287).

---

[22]     Swollen joints happen when there's an increase of fluid in the tissues that surround the joints. Joint swelling is common with different types of arthritis, infections, and injuries. WebMD, Swollen Joints (Joint Effusion) *available at* http://arthritis.webmd.com/swollen-joints-joint-effusion.

Dr. Waltrip saw Plaintiff again on January 9, 2006 after her left knee gave out once again. (R. at 281). Dr. Waltrip diagnosed Plaintiff with chronic left patellar instability with a new grade II left MCL tear. (*Id.*) He gave her an MCL brace to wear for four weeks and ordered her to continue physical therapy. (*Id.*) She followed up with Dr. Waltrip on February 13, 2006, reporting that her knee still felt as if it were ready to give out. (R. at 280). Dr. Waltrip maintained the same diagnosis, but decided to order an MRI to rule out a loose body and to evaluate a patellofemoral joint[23]. (*Id.*) Plaintiff underwent this MRI on February 16, 2006, and her knee appeared normal, with no loose body. (R. at 258, 285). Despite this, Plaintiff returned to Dr. Waltrip on March 2, 2006 reporting that her knee pain was continuing. (R. at 278). Dr. Waltrip diagnosed her with continued mechanical symptoms in her left knee, a possible loose body, possible plica[24] and a history of patellar instability. (*Id.*) He recommended an arthroscopy to evaluate and remove the loose body, explaining to Plaintiff's mother that, although he may not find anything in the knee, he suspected that he would find something to explain her symptoms. (*Id.*)

Dr. Waltrip performed the operation, a left knee arthroscopy and plica excision, on March 21, 2006. (R. at 256). He systematically inspected Plaintiff's knee and found a small plica, but no loose bodies. (*Id.*)

After the operation, Plaintiff attended physical therapy at Eagle Physical Therapy. (R. at 292-302). Her first visit was on April 6, 2006, when Jennifer Guardino, MPT, determined that she should undergo treatment three times a week for three weeks to restore strength and

---

[23] One of the knee joints. The knee has three parts. The thigh bone (femur) meets the large shin bone (tibia) forming the main knee joint. This joint has an inner (medial) and an outer (lateral) compartment. The kneecap (patella) and the femur form a third joint, called the patellofemoral joint. MedicineNet.com, Patellofemoral Joint, *available at* http://www.medterms.com/script/main/art.asp?articlekey=8848.

[24] The synovial plica are membranes that separate the knee into compartments during fetal development. These plica normally diminish in size during the second trimester of fetal development. In adults, they exist as sleeves of tissue called "synovial folds," or plica. In some individuals, the synovial plica is more prominent and prone to irritation. About.com, Plica Syndrome, http://orthopedics.about.com/cs/otherinformation1/a/plica.htm.

flexibility to her knee. (R. at 301). Plaintiff missed physical therapy appointments on April 11 and 12, due to lack of transportation and GED classes, respectively. (R. at 298). On April 27, Ms. Guardino assessed Plaintiff's progress and reported that most of the goals of physical therapy had been reached. (R. at 292). However, Plaintiff still reported 3/10 on the pain scale for her knee and that the range of motion and flexibility for her left knee was still not equal to that of her right. (*Id.*)

During Plaintiff's second physical therapy session on October 18, 2010, Plaintiff complained that exercise was causing her discomfort in her right hip. (R. at 479). This pain continued, and on November 4, 2010, the attending physical therapist reported that she was complaining of knee pain. (R. at 477). Dr. McGowan, the orthopedic doctor in charge of Plaintiff's physical therapy, sent her to Dr. Ari E. Pressman of The Orthopedic Group for her knee problems. (R. at 487). Upon seeing Plaintiff on November 24, 2010, Dr. Pressman noted that she reported "ongoing trouble" with her knee, that she had a history of knee pain for many years, and that she feels her knee pop to the side. (R. at 487).

## C. Administrative Hearing

A hearing regarding Plaintiff's application for SSI was held on November 30, 2010 in Morgantown, West Virginia before ALJ Mark Swayze. (R. at 8, 37). Plaintiff appeared with the assistance of her attorney, Mark Mehalov. (R. at 5, 37). James Ganoe, an impartial vocational expert[25], also testified. (R. at 37). Plaintiff reported that she was single but had a fiancé and a son, and lived with her fiancé's father. (R. at 46). She testified that she was currently unemployed and that her last job was with Adecco in 2008. (R. at 52). She worked as a "line

---

[25]     Mr. Ganoe has thirty years of leadership in the areas of counseling and job placement of persons with disabilities, budget management, program planning and coordination, resource development, and staff development, training and supervision. (R. at 130). Since 2005, he has been self-employed, providing job development services for persons with disabilities who require new careers by performing job modifications, coaching and follow-up services. (*Id*.) He has been a vocational expert since 1999, providing impartial expert opinion evidence at the hearing level of the Social Security disability claims process. (*Id.*)

prep," in which she prepared simple meals, but was fired after two months because of her absences. (R. at 53). She stated that she was currently receiving $279 of food stamps per month. (R. at 52). She reported that her fiancé is employed as a cashier at Dollar General. (R. at 52). She said that she did not have a driver's license, nor had she ever had one. (R. at 48).

Plaintiff provided testimony about her education. (R. at 50). She stated that she completed the ninth grade before leaving high school, and has attempted to get her GED but has not completed it. (*Id.*) She attended special education classes in school starting in the first grade. (*Id.*). She reported being able to read and write in English, though mostly only simple words. (*Id.*) While she claimed to be capable of basic arithmetic, she denied being able to make change. (R. at 51-52).

Plaintiff answered specific questions regarding her physical condition. (R. at 45). She reported that she was right handed, five feet four inches tall, but was not sure as to her weight. (*Id.*) She told the judge that she smoked about a half a pack of cigarettes per day, which she had been doing since she was about age fourteen. (R. at 49). She confirmed that she was unable to work because she suffered from problems with her lower back, her left knee, and with depression. (R. at 54).

As to her lower back pain, Plaintiff related the sensation to feeling "like someone is stabbing me," which makes sleeping and sitting difficult for her. (R. at 54). As a result, she can barely walk a mile. (R. at 55). With the help of her attorney, she clarified that she was not sure how long a mile was, and that she realistically could probably only walk fifty yards. (R. at 69). She claimed that she has had this problem for years, but that the pain has increased since the birth of her son. (*Id.*) At the time of the hearing, she reported being engaged in physical therapy. (R. at 56). After a physical therapy session, Plaintiff reports that she feels much better, but that

the relief is temporary and when she has more than two days between therapy, such as over the weekend, she experiences severe pain again. (*Id.*) She denied taking any medications for the pain, though she noted that in 2009 she had been prescribed ibuprofen, which did not help. (*Id.*) She stated that she feels pain in her back constantly, but that it is worse when the weather is cold. (R. at 57). She occasionally uses a heating pad for relief, particularly at night. (*Id.*)

As to her left knee, Plaintiff claimed that her knee has been popping out of place, forcing her to "try and pop it back in" though "sometimes it won't go back in." (R. at 57). She said that her knee pops out two to three times a month. (R. at 58). She reported that her knee hurts very badly for two to three hours after she is able to pop it back into place. (*Id.*) She informed the ALJ that she was scheduled to have surgery on her knee in January 2011 to put her knee back into place. (*Id.*)

Plaintiff also answered questions as to her depression. (R. at 59). She reported that her depression was not as severe as it had been previously. (*Id.*) Prior to 2008, Plaintiff stated that she was on medication because she "was trying to commit suicide and stuff." (*Id.*) Since then, she had not been on any medication for depression. (*Id.*) She admitted that her current depression symptoms may be tied to her inability to work due to her physical problems. (R. at 60). She elaborated that she was depressed because she cannot engage in her preferred activities, like "chasing after her son, taking him to the park." (*Id.*) She stated that her depression caused her to have problems speaking in front of new people or a large group of people, though she had no problem talking with family and friends. (R. at 61).

Plaintiff admitted to watching four to five hours of television per day, though her back pain forced her to get up and move around intermittently. (R. at 61- 62). She denied reading because it is too frustrating for her. (*Id.*) She stated that she takes care of her son, and watches

him until her fiancé arrives home from work. (*Id.*) She prepares her son's meals as well as her own, bathes him, and dresses him. (R. at 64) She reported sometimes being able to complete chores around her home, though she says that she often does not complete them due to her back and knee pain. (*Id.*) She estimated that she washes dishes once and laundry twice a week. (R. at 65). She additionally claimed that she cleans the house about once a week. (R. at 66). If she is unable to complete these chores, her fiancé assists her. (R. at 64-66). She stated that she can lift no more than ten pounds comfortably. (R. at 66). Plaintiff claimed that she sometimes has to lie down and rest during the day, though she tries to avoid doing this. (R. at 67). Plaintiff said that she goes grocery shopping about once a month with her fiancé's father. (R. at 69). She admitted that she walks through the aisles at the grocery store, but stated that she has to "lean on the buggy." (R. at 70).

At the conclusion of Plaintiff's testimony, the ALJ examined the vocational expert by posing hypothetical questions. (R. at 70). For his first hypothetical question, the ALJ began by asking Mr. Ganoe to consider a person of the same age, education, and work experience as Plaintiff, who retains the capacity to perform light work defined as lift, carry up to 20 pounds occasionally and up to 10 pounds frequently, and able to stand/walk for up to six hours and sit for up to six hours in an eight hour workday with normal breaks, with the following limitations: occasional balancing, stooping, kneeling, crouching, crawling, climbing of ramps and stairs; no climbing of ladders, ropes, or scaffolds; work that allows for a sit/stand option, allowing the person to alternate sitting or standing positions at one hour intervals throughout the workday without going off task; work that is unskilled; work that requires no more than limited reading, writing, and math skills; work limited to simple, routine, and repetitive one to two step tasks; work limited to a low stress environment defined as having only decision making required and

only occasional changes in the work setting; work that requires only occasional interaction with the public and coworkers; and work that avoids concentrated exposure to extreme temperatures and hazards such as dangerous machinery and unprotected heights. (R. at 72- 73). Based on these limitations, the ALJ asked Mr. Ganoe if there were any jobs in the regional or national economy that such an individual could perform. (R. at 74)

Under the light exertional level, Mr. Ganoe identified the position of a price marker, of which there were 319,000 jobs nationally and 1,675 regionally. Because of the sit/stand limitation, he reduced those numbers by half. (R. at 74). He pinpointed the position of laundry worker, working as a folder, of which there were 88,000 jobs nationally and 1,300 regionally. (*Id.*)

The ALJ posed a second hypothetical in which he asked Mr. Ganoe to consider the same hypothetical individual further limited to sedentary work, defined as lifting up to 10 pounds occasionally, standing/walking for about two hours and sitting for up to six hours in an eight hour workday with normal breaks. (R. at 74). Mr. Ganoe identified a bench worker position, of which there were 103,000 nationally and 2,100 regionally. (R. at 75). He also noted general sorter and setter, of which there were 25,000 nationally and 900 regionally. (*Id.*)

The ALJ then asked Mr. Ganoe what a typical employer would tolerate as to an employee who was late to work or had unexcused, unscheduled absences. (R. at 75). He responded that most employers will allow an individual up to one off day per month, though some will allow as much as two days per month. (*Id.*) He said that an individual is usually given a verbal warning if consistently late, then a written reprimand, and if the tardiness continues that individual will be dismissed. (*Id.*) The ALJ asked what are the customary number and lengths of breaks which a typical employer permits, and Mr. Ganoe responded that most employers will give a 15 minute

break during the morning, a half hour to an hour for lunch, and a 15 minute break during the afternoon. (R. at 76). The ALJ asked Mr. Ganoe how much time an employer would typically tolerate an employee being off task during the day, to which he responded ten percent. (*Id.*) The ALJ asked what would happen if Plaintiff were to exceed the listed tolerances slightly, and Mr. Ganoe responded that she would lose her employment. (*Id.*)

## III. THE ALJ'S OPINION

The ALJ decided that Plaintiff retained the residual functional capacity to perform light, unskilled work and that there were a significant number of representative jobs available in the national economy which she could perform. (R. at 14 – 21). The ALJ first acknowledged that Plaintiff satisfied Step One of the analysis because she had not been engaged in substantial gainful activity in accordance with 20 C.F.R. § 416.971 since her application date of July 10, 2009. (R. at 11). At Step Two, the ALJ found that Plaintiff's major depressive disorder, borderline intellectual functioning, personality disorder, ADHD, lumbago, suprapatellar malalignment of the left knee with a sublixing patella, and obesity were medically determinable severe impairments, pursuant to 20 C.F.R. § 416.920(c). (*Id.*) However, he found that Plaintiff's scoliosis of the spine was a non-severe impairment because her treating physicians noted that the condition never produced any symptoms. (*Id.*) Therefore, the ALJ decided this additional impairment did not have more than a minimal impact on Plaintiff's ability to work. (*Id.*)

At Step Three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or exceeded one of those listings in 20 C.F.R. Pt. 404, Subpt. B, App'x 1, 20 C.F.R. §§ 416.920(d), 416.925, and 416.926. (*Id.*) In reaching his decision, the ALJ found that the medical evidence did not contain the objective signs, symptoms, or findings, or the degree of functional limitations necessary for any of Plaintiff's physical or

mental impairments, singularly or in combination, to meet or equal the severity of a listing. (R. at 11-14). The ALJ noted that he considered Plaintiff's obesity in accordance with SSR 02-01 in making this determination, but concluded it did not have a significant impact on her other body systems or significantly affect her ability to ambulate. (R. at 12). He relied on opinions from state agency medical consultants, Plaintiff's school medical personnel, as well as the medical records, and determined that no treating or examining medical source has stated that Plaintiff had an impairment or combination of impairments that could meet or equal a listing. (R. at 11-14). He added that the evidence shows that Plaintiff is able to live independently. (R. at 13). He also found no credible evidence that she demonstrated sub-average general intellectual functioning before age 22, and there was no reliable evidence of a valid IQ score of 70 or less. (*Id.*).

Moving to an evaluation of Plaintiff's residual functional capacity, the ALJ opined that, considering the record in its entirety, she retained the ability to perform light work as defined in 20 C.F.R. § 416.967(b), subject to certain restrictions. (R. at 14). Here, he considered the objective medical evidence concerning each of Plaintiff's impairments. (R. at 14-20). Additionally, he considered Plaintiff's subjective complaints in accordance with SSR 96-7p and 20 C.F.R. § 416.929. (R. at 15). He found that her medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that her statements concerning the intensity, persistence, and limiting effects of her alleged symptoms were not credible to the extent that they were inconsistent with the residual functional capacity assessment. (*Id.*). Although Plaintiff claimed to have a severe back condition, the ALJ noted that the most recent x-rays were normal, she was able to ambulate without assistance, and she only regularly attended physical therapy for one month in late 2010. (R. at 16). Thus, the ALJ concluded that Plaintiff had only a mild back condition that was adequately accommodated by restricting her to light

work activities and limiting certain postural movements. (*Id.*) As to Plaintiff's knee problems, the ALJ acknowledged that medical records supported a knee problem, but found that there was no medical evidence addressing its severity and impact on her ability to work. (*Id.*) He observed that Plaintiff was not taking narcotic based pain relieving medications for her condition, and that she would soon be undergoing a surgery that might alleviate the symptoms she does have. (*Id.*) Thus, the ALJ ruled that Plaintiff's knee condition was adequately accommodated. (*Id.*) Finally, the ALJ determined that Plaintiff's allegations of severe mental impairments were undermined by her failure to use medications designed to treat such symptoms. (*Id.*) In general, the ALJ found that Plaintiff's daily activities, including performing chores around the house, shopping, and caring for her son, did not support her allegations of severe impairment. (R. at 16-17).

At Step Four, the ALJ determined that Plaintiff had no past relevant work to which she could return. (R. at 20). At Step Five, the vocational expert identified a number of light and sedentary jobs that someone with Plaintiff's limitations could perform. (*Id.*) Thus, the ALJ found Plaintiff to be not disabled within the meaning of the Act. (R. at 21).

## IV. OVERVIEW OF THE PARTIES' ARGUMENTS

Plaintiff argues that summary judgment in her favor is proper because the ALJ's decision was not based upon substantial evidence, was arbitrary and capricious, and was in error of the law. (Docket No. 10 at 1). Specifically, she claims that the ALJ erred because Plaintiff should have been found presumptively disabled given that she meets listing 12.05(c). (Docket No. 11 at 1). Additionally, she argues that the residual functional capacity finding was not supported by substantial evidence, nor was the credibility assessment. (*Id.*) Finally, Plaintiff alleges that the ALJ did not meet his burden at Step 5 because the vocational expert's testimony could not provide substantial evidence to support the denial. (*Id.*)

In response, Defendant asserts that substantial evidence supports the Commissioner's finding that Plaintiff could perform a range of unskilled, light work, and is therefore not disabled under the Act. (Docket No. 13 at 1). The Court will address the issues as they sequentially fall in the five-step analysis.

## V. STANDARD OF REVIEW

To be eligible for disability benefits under the Act, a claimant must demonstrate to the Commissioner that she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment, which has lasted or can be expected to last for a continuous period of at least twelve months, or which can be expected to result in death. 42 U.S.C. § 423(d)(1)(A); *Brewster v. Heckler*, 786 F.2d 581, 583 (3d Cir. 1986). To determine whether a claimant has met the requirements for disability, the Commissioner must utilize a five-step sequential analysis in reviewing the claim. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x. 1; (4) whether the claimant's impairments prevent her from performing past relevant work; and (5) if the claimant is incapable of performing her past relevant work, whether she can perform any other work which exists in the national economy. 20 C.F.R. § 404.1520(a) (4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume past relevant work, the burden shifts to the Commissioner at Step Five to prove that, given the claimant's mental or physical limitations, age, education, and

work experience, she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[26], 1383(c)(3)[27]; *Schaudeck v. Comm'r Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. § 706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir.1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390.

When considering a case, a district court cannot conduct a *de novo* review, nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F.Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196-97. Further, "even where this court acting *de novo* might have reached

---

[26] Section 405(g) provides in pertinent part: "Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action… brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business." 42 U.S.C. § 405(g).

[27] Section 1383(c)(3) provides in pertinent part: "The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title." 42 U.S.C. § 1383(c)(3).

a different conclusion… so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1191 (3d Cir. 1986).

## VI. DISCUSSION

### A. Listings Determination

First, Plaintiff argues that the ALJ erred in failing to determine that she was disabled according to Listing 12.05(c) (Mental Retardation). (Docket No. 11 at 7). "For a claimant to show that his impairment matches a listing, it must meet all of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Williams v. Sullivan*, 970 F.2d 1178, 1186 (3d Cir. 1992) (emphasis in original) (quoting *Sullivan v. Zebley*, 493 U.S. 521 (1990)).

The applicable listing states, in relevant part:

> 12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
> …
>  C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;
> 20 C.F.R., Pt. 404, Subpt. P, App'x 1, Listing 12.05C.

The ALJ declined to find Plaintiff in conformity with the above listing because he found that she failed to prove that she suffered from significant sub-average intellectual functioning with deficits in adaptive functioning prior to age 22. (R. at 12). As established by the United

States Court of Appeals for the Third Circuit in *Markle v. Barnhart*, 324 F.3d 182 (3d Cir. 2003), a finding of disability under 12.05(c) requires a claimant "i) have a verbal, performance, or full scale IQ of 60 through 70, ii) have a physical or other mental impairment imposing additional and significant work-related limitations of function, and iii) show that the mental retardation was initially manifested during the developmental period (before age 22)." (*Id.* at 187.)

The second prong of the above test is satisfied in this case. The ALJ determined that Plaintiff's medically determinable severe impairments included major depressive disorder, borderline intellectual functioning, personality disorder, attention deficit hyperactivity disorder, lumbago, suprapatellar malalignment of the left knee with a subluxing patella, and obesity. (R. at 11). *Markle,* 324 F.3d at 187-88. The ALJ went on to find that these impairments restrict Plaintiff to work not involving climbing ladders, ropes or scaffolds, and with no more than occasional balancing, stooping, kneeling, crouching, crawling, or climbing of ramps/stairs; work that involves a sit/stand option allowing her to alternate between sitting and standing positions at one hour intervals throughout the work day without breaking task; work that entails no concentrated exposure to extreme temperatures or hazards (such as dangerous machinery or unprotected heights); unskilled work activity that is limited to simple, routine and repetitive 1-2 step tasks; limited to a low stress environment defined as having only occasional decision making required and only occasional changes in the work setting; entail only occasional interaction with the public and coworkers; and require no more than limited reading, writing, and math skills. (R. at 14). (*Id.*) This is sufficient to satisfy Listing 12.05(c)'s requirement of a physical or other mental impairment imposing additional and significant work-related limitations. (*Id.* (citing 65 Fed.Reg. 50746, 50772)).

However, Plaintiff failed to meet her burden at the first and third prongs of the test. The ALJ called into question the veracity of Plaintiff's most recent IQ test results as well as her claim of mental retardation prior to the end of the developmental period. (R. at 13). Testing in 2007 revealed a full scale IQ of 70 and a verbal IQ of 69. (R. at 13). However, the ALJ observed that the examiners that performed the WAIS-III intelligence test questioned the validity of some aspects of the testing, suggesting that the testing may be an underestimate of the claimant's abilities in some respects. (*Id.*) In addition, the ALJ noted that, at the hearing, Plaintiff's counsel agreed that Plaintiff "does not presently demonstrate significantly sub average general intellectual functioning with deficits in adaptive functioning." (*Id.*) Furthermore, the ALJ wrote that other testing on the record suggests that Plaintiff's abilities are low average to borderline. (*Id.*). For instance, the Plaintiff took the WISC-IV intelligence test in March 2004 and achieved a 79 in verbal comprehension, 71 in perceptual reasoning, 80 in working memory, 85 in processing speed, and a full-scale IQ of 80. (*Id.*) These scores, the ALJ found, are considered low average or borderline. (*Id.*)

The ALJ also considered a psychological evaluation performed by Dr. Randon C. Simmons, M.D., when Plaintiff was 16 years old. (*Id.*) At that time, Dr. Simmons suggested that Plaintiff might have an undiagnosed learning disorder, but he did not diagnose mental retardation. (*Id.*) Similarly, the ALJ took note of a teacher questionnaire included in the record, in which Plaintiff's special education teachers and the school counselor at Mars High School described her reading level as low, her math level as extremely below average, and her written language as borderline. (*Id.*) The ALJ ruled that these findings did not establish significantly sub average general intellectual functioning with deficits in adaptive functioning, instead indicating

severe weakness in one particular area of academic functioning. (*Id.*) This weakness, the ALJ stated, is adequately accommodated by Plaintiff's residual functional capacity. (*Id.*)

The ALJ placed little weight on a childhood disability evaluation form completed in 2006 by Dr. Grant Croyle, Ph.D., a state agency consultant. (*Id.*) Dr. Croyle assessed marked limitations in her ability to acquire and use information, as well as attending and completing tasks. (R. at 14). This assessment was primarily made on the facts that Plaintiff repeated first grade, that she needed assistance and encouragement in order to function at an acceptable level, and that she had difficulty maintaining concentration, persistence, and pace. (*Id.*) The ALJ found this assessment to be of little probative value because there was no discussion of the evidence upon which Dr. Croyle relied when reaching his conclusions. (*Id.*) According to the ALJ, the 2004 IQ test undermines Dr. Croyle's conclusions, as does Dr. Croyle's own, more recent, 2009 mental residual functional capacity assessment, in which he assessed only moderate difficulty in maintaining concentration, persistence or pace. (*Id.*) The ALJ reasoned that if Plaintiff truly demonstrated sub average general intellectual functioning with deficits in adaptive functioning, it would not have significantly improved over the course of three years. (*Id.*)

What the ALJ gleaned from the medical history was a notable lack of deficits in adaptive functioning prior to age twenty-two through the time of her alleged disability. *Cf. Markle*, 324 F.3d at 188 ("Here, the evidence before the ALJ is consistent with a finding that Markle's mental condition remained constant from childhood through the present"). Further, the ALJ was entitled to reject Plaintiff's IQ scores based upon objective evidence, and did so without use of personal observations of Plaintiff or speculative inferences based upon the record. *Markle*, 324 F.3d at 186-87; *Morales v. Apfel*, 225 F.3d 310, 318-19 (3d Cir. 2000). The Court of Appeals in *Markle*

noted that justifiable rejection of IQ scores occurred in cases wherein the claimant was the primary caretaker of a child. *Markle*, 324 F.3d at 187. Plaintiff's case is not dissimilar.

While the Court does not dispute that Plaintiff suffers from significant mental impairment, the ALJ's rationale that this impairment did not meet the requirements for a finding of disability under 12.05(c) is supported by the record. Plaintiff's 2004 WISC-IV test results, Dr. Croyle's 2009 mental residual functional capacity assessment, and the fact that the examiners who performed the 2007 WAIS-III intelligence test questioned the validity of some aspects of the testing demonstrate that she did not exhibit the degree of deficit in adaptive functioning envisioned under 12.05(c).

### B. RFC Determination

Additionally, Plaintiff contends "The residual functional capacity finding is not supported by substantial evidence." (Docket No. 11 at 1). Plaintiff argues that the ALJ wrongfully refused to give significant weight to Dr. Prybock's Global Assessment score of 45, despite giving weight to that same doctor's other assessments. (*Id.* at 11). According to Plaintiff, this reflects the ALJ's "misunderstanding of [Plaintiff]'s cognitive difficulties and reflects a failure to adequately develop the record and otherwise apply the appropriate legal standards." (*Id.* at 12). It is also Plaintiff's contention that the record was not adequately developed regarding Plaintiff's mental impairments, and that the ALJ should have remanded the case for further development of the record. (*Id.* at 12). However, the Court finds that the ALJ did base his residual functional capacity determination on substantial evidence.

"Residual functional capacity is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Burnett v. Commissioner of Social Security*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359, *fn. 1*

(3d Cir. 1999)); *see also* 20 C.F.R. §404.1545(a). "An ALJ must consider all relevant evidence when determining an individual's RFC. 20 C.F.R. § 404.1545(a); *Burnett,* 220 F.3d at 121. This evidence includes "medical records, observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others." *Fargnoli v. Halter*, 247 F.3d 34, 41 (3d Cir. 2001). An individual claimant's residual functional capacity is an administrative determination expressly reserved to the Commissioner. 20 C.F.R. § 416.927(c)(2). The ALJ's finding of residual functional capacity must be "accompanied by a clear and satisfactory explication of the basis on which it is based." *Fargnoli*, 247 F.3d at 41 (quoting *Cotter v. Harris*, 642 F.2d 700 (3d Cir. 1981)).

Here, the ALJ found that the Plaintiff had the RFC to perform light work as defined in 20 C.F.R §416.967(b) except that the type of work must:

> Entail no climbing ladders, ropes or scaffolds and no more than occasional balancing, stooping, kneeling, crouching, crawling, or climbing of ramps/stairs; afford a sit/stand option allowing the claimant to alternate between sitting and standing positions at 1 hour intervals throughout the work day without breaking task; entail no concentrated exposure to extreme temperatures or hazards (such as dangerous machinery or unprotected heights); be unskilled work activity limited to simple, routine and repetitive 1-2 step tasks; be limited to a low stress environment defined as having only occasional decision making required and only occasional changes in the work setting; entail only occasional interaction with the public and co-workers; and require no more than limited reading, writing, and math skills. (R. at 14).

The ALJ considered "all symptoms and the extent to which these symptoms can be reasonably accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929 and SSRs 96-4p and 96-7p." (*Id.*) Plaintiff's alleged disabilities can be separated into three categories: back problems, knee problems, and neck problems. (*Id.*) Though the ALJ found that Plaintiff's medically determinable impairments could

be expected to cause the alleged symptoms, he concluded that Plaintiff maintained the ability to perform light work despite the problems she faced in each of the aforementioned categories. (*Id.* at 15).

The ALJ stated that evidence of record shows only that Plaintiff has a relatively mild back condition, which would not be expected to produce the severe symptoms from which Plaintiff claims to have been suffering. (*Id.*) An x-ray of Plaintiff's lumbosacral spine in February 2005 revealed no fractures or malalignment in the lumbar spine, nor evidence of spondylolisthesis[28] or spondylolysis.[29] (*Id.*) A simultaneous x-ray of the dorsal spine showed no fracture or malalignment in the thoracic spine, intact pedicles[30], and no destructive process. (*Id.*) Spinal x-rays from 2012 were also interpreted as normal. (*Id.*) Additionally, the ALJ considered the fact that the Plaintiff did not take any narcotic based pain relieving medications despite her allegations of quite limiting back pain. (*Id.*) He also took Plaintiff's inconsistent attendance at her prescribed physical therapy sessions into account. (*Id.* at 16). From this substantial evidence, the ALJ concluded that Plaintiff has, at most, a mild back condition that is adequately accommodated by restricting her in accordance with her RFC. (*Id.*)

Next, the ALJ determined that the RFC adequately accommodated Plaintiff for any problems caused by her knee injury. (*Id.*) He noted that Plaintiff does have a knee problem, but that "there is no medical opinion evidence addressing the severity of this

---

[28]     Spondylolisthesis is a condition in which a bone (vertebra) in the spine slips out of the proper position onto the bone below it. Medline Plus, "Spondylolisthesis," *available at* http://www.nlm.nih.gov/medlineplus/ency/article/001260.htm.
[29]     Spondylolysis is a condition in which the there is a defect in a portion of the spine called the pars interarticularis (a small segment of bone joining the facet joints in the back of the spine). Spine Health, "Spondylolysis and Spondylolisthesis," *available at* http://www.spine-health.com/conditions/spondylolisthesis/spondylolysis-and-spondylolisthesis.
[30]     The pedicle is a short projection of bone that comes off the back of the vertebral body. About.com, "Pedicles," *available at* http://backandneck.about.com/od/anatomyexplained/ig/Parts-of-a-Vertebra/Pedicle.htm.

condition and its impact [on] the claimant's ability to perform work activities." (*Id.*) A review of the record confirms the same.

Finally, the ALJ found substantial evidence to support the contention that the RFC adequately accommodated Plaintiff's mental impairments. (*Id.* at 16 – 20). He pointed out that her daily activities were not limited to the extent one would expect them to be given her complaints of severe mental and physical symptoms and limitations. (*Id.* at 16). In fact, he found that Plaintiff's allegations of severe mental impairment were not credible because her treatment history does not indicate any intractable condition that would preclude Plaintiff from performing at least light work activity. (*Id.*) Additionally, her medical history failed to demonstrate conditions to the degree of severity which Plaintiff has alleged. (*Id.*) He then noted that she had worked sporadically even prior to the disability onset, and that she cares for her son. (*Id.*) In light of this history, the ALJ questioned whether Plaintiff's unemployment is actually due to medical impairments. (*Id.*)

If an ALJ concludes that the claimant's testimony is not credible, the specific basis for such a conclusion must be indicated in his or her decision. *Cotter v. Harris*, 642 F.2d 700 (3d Cir. 1981). Ordinarily, courts defer to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess the witness's demeanor. *Reefer v. Barnhart*, 326 F.3d 376 (3d Cir. 2003). That standard is met here because the ALJ heard and evaluated all relevant evidence and adequately explained the reasoning behind his credibility determinations. (R. at 16-17). He determined that her statements concerning the intensity, persistence and limiting effects of her mental impairments were

not credible to the extent they were inconsistent with the residual functional capacity assessment.(*Id.*)

Plaintiff contends that the ALJ's RFC determination was not based on substantial evidence because the ALJ failed to fully develop the record. (Docket No. 11 at 13). To support this argument, Plaintiff cites *Rutherford v. Barnhart*, 399 F.3d 546, 557 (3d Cir. 2005). Indeed, in *Rutherford*, the Court of Appeals does say that the ALJ has a responsibility to develop the record, in the context of an inconsistency between a vocational expert's testimony and information contained in the Dictionary of Occupational Titles. (*Id.* at 557). In that case, the ALJ failed to inquire about such inconsistency on the record before relying only on the vocational expert's testimony in determining the residual functional capacity. (*Id.*) Nevertheless, the Circuit Court found that the ALJ had not violated his duty to fully develop the record. (*Id.*) No such inconsistency is alleged by Plaintiff in this case, so it is not apparent from the record how *Rutherford v. Barnhart* applies. However, upon review of the facts contained in this extensive record, substantial evidence adequately supports the ALJ's determination with respect to Plaintiff's residual functional capacity to perform work, subject to the medically established limitations.

### C. Credibility Assessment

Next, Plaintiff argues that the ALJ's credibility assessment was not supported by substantial evidence. (Docket No. 11 at 13). According to Plaintiff, the ALJ failed to consider the credibility of Plaintiff's subjective complaints according to the factors set forth in 20 C.F.R. § 416.929. (*Id.*) The ALJ's assessment of Plaintiff's subjective credibility has already been addressed in some depth, and Plaintiff's additional argument

does not change the Court's opinion that the ALJ did base his credibility determination on substantial evidence.

Plaintiff's allegations of severe mental impairments are supported mostly by subjective testimony; yet, the ALJ found that the evidence on the record undermined the credibility of such testimony. (R. at 16). The ALJ noted that there was no evidence in the record to indicate that Plaintiff used any medications to treat her psychiatric or mental symptoms. (*Id.*) Furthermore, the record showed that Plaintiff's daily activities are not limited to the extent one would expect given complaints of severe mental and physical limitations. (*Id.*) For instance, Plaintiff testified that she performs chores around the house, including dusting, laundry, vacuuming, and washing dishes. (*Id*.) She also does her own laundry, cares for a young child by bathing him, preparing his meals and playing with him during the day. (*Id.*) Accordingly, the ALJ properly determined that these factors "detract from the credibility of the claimant's allegations concerning the severity of her symptoms." (*Id.*)

The ALJ also considered testimony from a number of medical professionals that discredited Plaintiff's complaints of severe mental illness. Dr. David Prybock stated that Plaintiff has fair abstraction abilities, average memory, and appropriate social judgment. (R. at 18). He found that her ability to respond to typical work pressures and changes in routine were only moderately impaired. (*Id*.) Dr. Prybock did assign Plaintiff a GAF score of 45, but the ALJ accorded little weight to this score, because GAF scores are based entirely on the claimant's subjective complaints. (*Id.*) On the other hand, the ALJ accorded great weight to Dr. Prybock's assessment because he personally examined the Plaintiff and "had the opportunity to assess the reliability" of her complaints firsthand.

(*Id.*) The ALJ also gave significant weight to the assessment of Dr. Croyle, who diagnosed "a mild restriction in the activities of daily living and moderate difficulty maintaining social functioning and concentration, persistence, or pace with no episodes of decompensation of extended duration." (*Id.*) The ALJ found that this assessment was consistent with previous medical assessments and with Plaintiff's living habits. (*Id.* at 20).

Furthermore, the ALJ did not find that additional testimony from Plaintiff's grandmother, Geraldine Keith, bolstered Plaintiff's credibility. (*Id.* at 17) Ms. Keith stated that she removed the Plaintiff from school because she was stressed, she upset easily and "crie[d] over everything," had trouble with reading and math, and had difficulty understanding and making decisions. (*Id.*) The ALJ was unconvinced by these statements because they did not address the Plaintiff's physical complaints and because they were made in 2006, three years before the alleged disability onset date. (*Id.*)

Courts defer to an ALJ's credibility determination because he or she has the opportunity at a hearing to assess the witness's demeanor. *Barnhart*, 326 F.3d at 376. Because the ALJ heard and evaluated all relevant evidence and adequately explained the reasoning behind his credibility determination, this Court will defer to the ALJ's credibility assessments. (R. at 16-17).

### D. Hypothetical Question

Finally, the Plaintiff argues that the hypothetical question posed to the vocational expert was "necessarily not a complete and accurate portrayal of Keith's abilities" because of "errors in weighing the medical opinion evidence, credibility, and determining

RFC." (Docket No. 11 at 14). Thus, Plaintiff argues, "the vocational expert testimony cannot provide substantial evidence to support the denial." (*Id.*)

As addressed above, Plaintiff's allegations that there were errors in weighing the medical opinion evidence, credibility, and RFC have no merit. Therefore, the hypothetical question was an accurate and complete portrayal of Keith's abilities.

## VII. CONCLUSION

Based on the foregoing, the decision of the ALJ is adequately supported by substantial evidence contained within the record within the meaning of 42 U.S.C. § 405(g). Therefore, Plaintiff's Motion for Summary Judgment is DENIED; Defendant's Motion for Summary Judgment is GRANTED; and the decision of the Commissioner is AFFIRMED. Appropriate orders follow.